## SAMUEL GOLD v. GEO. C. CAMPBELL ET AL.

### Decided March 3, 1909.

**1.—False Imprisonment—Definition.**

False imprisonment consists in imposing by force or threats an unlawful restraint upon a man's freedom of locomotion. It is only necessary that the individual be restrained of his liberty without any sufficient legal cause therefor, whether by words or acts which he fears to disregard. Any arrest or detention of a person is presumed to be unlawful, and the burden is upon the person making the arrest or causing the detention to show that it was lawful.

**2.—Same—Evidence—Arrest without Warrant.**

In an action against a sheriff and his bondsmen for damages for false imprisonment, where it appeared that the plaintiff was arrested without warrant in his own place of business upon the verbal statement of a third party that plaintiff had defrauded him in a sale of goods, evidence considered and held insufficient to justify the arrest without warrant under any provision of the Code of Criminal Procedure of this State or any ordinance of the city where the arrest was made.

**3.—Same—Damages.**

In a case of false imprisonment the plaintiff is entitled to recover nominal damages at least, and, if the evidence warrants it, he is entitled to recover the expenses reasonably incurred to procure his discharge from the restraint, for loss of time, interruption of his business, and suffering both bodily and mentally occasioned by the wrongful imprisonment. Damage to one's business, however, would be too remote. The sound discretion of the jury is the only practical measure of damages. If the defendant acted recklessly, or wilfully and maliciously with a design to oppress and injure, the jury may allow exemplary damages.

**4.—Same—Mitigation—Evidence.**

Where arrest was without authority at the time it was made, the complaint, information and warrant of arrest issued afterwards were not inadmissible in evidence to justify or mitigate the unlawful act.

**5.—Same—Liability of Bondsmen.**

To charge the sureties on a sheriff's bond, the act complained of must not only be such as might rightfully be done by the sheriff as such but must have been actually done by him as sheriff under a claim of right to do it in his official capacity. Evidence considered, and held insufficient to render the sureties on a sheriff's bond liable in an action for false imprisonment.

Appeal from the County Court of El Paso County. Tried below before Hon. Albert S. Eylar.

*Atlos Jones,* for appellant.—The sureties on defendant Campbell's bond were liable, he having committed the false imprisonment in his official capacity and by virtue of his office as chief of police. Goodale v. Douglas, 5 Texas Civ. App., 697; Landrum v. Wells, 7 Texas Civ. App., 627; Newburn v. Durham, 10 Texas Civ. App., 655.

The court erred in refusing plaintiff's special instruction No. 1 for the reason that the only issue that should have been submitted to the jury was the amount of damages. Dinham v. Trinity Lumber Company, 73 Texas, 82; Gan v. Shaw & Son, 2 App. Civ. Cases, sec. 255.

Neither ignorance of the law nor good faith is a defense in an action for false imprisonment, and they can be considered only in mitigation of exemplary damages. Kamer v. Stump, 12 Texas Civ. App., 463.

*Jackson, Lea & Ware,* for appellees.

NEILL, ASSOCIATE JUSTICE.—Samuel Gold sued George C. Campbell and the sureties on his official bond as chief of police of the city of El Paso, to recover $495 actual and $100 exemplary damages for false imprisonment alleged to have been effected by plaintiff having been unlawfully arrested and imprisoned by one George Miller without a warrant while acting under the direction and command of the defendant Campbell.

The defendants answered by general and special exceptions to plaintiff's petition, a general denial, and pleaded specially, in justification of the imprisonment, a certain ordinance of the city, under which it was averred the arrest was made by Miller as a policeman.

After the court sustained the special exception embodied in the fifth paragraph of defendants' answer to plaintiff's petition, the case was tried before a jury and the trial resulted in a verdict and judgment in favor of the defendants.

The first assignment which attracts our attention is that which complains of the refusal of the court to set aside the verdict because it is unsupported by the evidence. As a decision of the question involved requires a consideration of the law pertaining to a case of this character, as well as a review of the evidence adduced in this

particular case, we will first expose the principles of law pertaining to the case, and, then, in the light of such principles, review the evidence for the purpose of determining whether it tends to support the verdict. If the probative force of the testimony should prove such that no reasonable man can deduce the conclusion from it that the defendant Campbell wrongfully imprisoned the plaintiff, then, if there was no error in the charge submitting the issue to the jury, the verdict must stand. But on the other hand, if under the law pertinent to the evidence, no mind capable of receiving and weighing evidence directed to the proof of a specific fact, could, in the light of the law, come to any other conclusion than that Campbell wrongfully and without authority of law restrained the plaintiff of his liberty, it must be set aside.

There are certain God-given rights, which government is instituted and maintained to secure and protect all men in the equal enjoyment of—the proud, the humble, the poor, the rich, the citizen, the stranger and the sojourner. It matters not what adversities may have befallen him, or what complexion an Indian or an African sun may have burnt upon him, whoever and wherever he is, so long as he conforms his conduct to the law and does not exercise such rights to the injury or detriment of another or in disturbance of the peace and good order of society, neither government nor its officers, though they may wield a policeman's baton, handle a "Big Stick," and be epauleted, chevroned and arrayed like the Sons of Veterans at a Confederate Reunion, can rightfully deprive him of such rights. And even when his conduct is such as to authorize the government, through its officers, to deprive or restrain him in the exercise of such right, such authority must be exercised according to law.

Among these natural rights are the enjoyment of life, liberty and property. The bill of rights, which is incorporated in our Constitution, declares that no citizen shall be deprived of life, liberty, property, etc., except by due course of the law of the land. It then declares that "everything in this 'bill of rights' is excepted out of the general powers of government, and shall forever remain inviolate and all laws contrary thereto . . . shall be void." If, then, the plaintiff was deprived of his liberty by the defendant Campbell in any way, except by due course of the law of the land, the latter was unquestionably amenable to him in this action.

False imprisonment consists of imposing by force or threats an unlawful restraint upon a man's freedom of locomotion. *Prima facie* any restraint put by fear or force upon the actions of another is unlawful and constitutes a false imprisonment, unless a showing of justification makes it a true or legal imprisonment. The wrong may be committed by words alone or by acts alone, or by both, and by merely operating on the will of the individual by personal violence, or by both. All that is necessary to constitute false imprisonment is that the individual be restrained of his liberty without any sufficient legal cause therefor, and by words or acts which he fears to disregard. Any arrest or detention of a person is presumed to be unlawful and the burden is upon the defendant to show that it was lawful. (Cooley on Torts (3d ed.), 296-8.)

False imprisonment is an offense under the laws of Texas, punishable by a fine not exceeding five hundred dollars, and may be by confinement in the county jail not exceeding one year, and is thus defined: "False imprisonment is the willful detention of another against his consent, and where it is not expressly authorized by law, whether such detention be effected by an assault, by actual violence to the person, by threats or by any other means which restrains the party so detained from removing from one place to another as he may see proper." Penal Code, art. 618. However, article 622 provides that, "It is not an offense to detain a person in the cases and for the objects mentioned in article 593 as justifying the use of force, but whenever it is assumed as a justification that such circumstances existed, it must be shown also that the detention was necessary to effect any of the objects set forth in said article."

After we have stated from the record the evidence upon the question of plaintiff's imprisonment, which will show beyond a peradventure of a doubt that he was imprisoned, we will then determine whether anyone can come to any other conclusion than that the defendant Campbell was a party to such imprisonment; and, if no other conclusion can be deduced, we will then inquire whether under the law the evidence tends to justify him in making such imprisonment.

James Miller testified in substance that on February 4, 1908, he was a policeman of the city of El Paso when a Mexican came to him and told him that plaintiff Gold had agreed with him to sell him a dozen silk handkerchiefs, and to change $280 United States money into Mexican money for him at the rate of one dollar of United States money for two of Mexican; that he was to pay $24 for the handkerchiefs, and plaintiff was to keep $24 of his (the Mexican's) money for changing it, and that the Mexican asked him to get his money and make plaintiff take back the handkerchiefs. That he, Miller, then went with the Mexican to plaintiff's store, on El Paso Street, and demanded of plaintiff to return the Mexican his money and take back the handkerchiefs, but that plaintiff said that the Mexican agreed to pay him for changing the money, and refused to do so unless his attorney so advised him; that plaintiff asked time to go and consult his attorney, which he, Miller, granted him; and that when plaintiff returned from his attorney he refused to take the handkerchiefs or give back the money. Whereupon Miller told plaintiff that he would have to take him to the chief of police; and thereupon plaintiff, without resistance, accompanied him to the chief of police, at the police station of the city; that when he took plaintiff to the chief of police he had no warrant and did so without direction or request of the chief; that when they got to the police station they found defendant Campbell, the chief of police, and both plaintiff and the Mexican told him their stories about their transaction; and that after talking with them for some time and consulting with the captain of the police force, and planning to find out what charge to make against plaintiff, the chief, Campbell, told the captain he had better lock plaintiff up and investigate the matter; that they then locked plaintiff up under orders from the chief of police;

that he was locked up at about 12.30 p. m., under orders from the chief of police, Campbell, who was the authority at the time.

The defendant, George C. Campbell, testified as follows: "I was chief of police of the city of El Paso, Texas, on February 4, 1908, when plaintiff was brought to the police station by James Miller. A Mexican, who was a stranger to me and who was on his way from Arizona to Mexico, came with them. The Mexican complained to me that plaintiff had swindled him out of his money and showed me two dozen handkerchiefs, and said plaintiff had charged him two dollars apiece for them. He also said plaintiff had charged him $24 for changing $280 United States money into Mexican money. I questioned plaintiff and talked with him three quarters of an hour, or an hour, and I examined the handkerchiefs and told plaintiff I had been a merchant, and that the handkerchiefs were not all silk, all of them, some were raw silk and not worth more than twenty-five cents, which he admitted to me; he also admitted to me that some one or two were worth about seventy-five cents. I told him he had charged an exorbitant price for the handkerchiefs and he said he was not in business for his health, that he had a big expense and had a right to make whatever he could on his goods. At my direction Captain Edwards called up the banks and Judge Lea and asked them if a man was required to take out a license to discount money. Captain Edwards told Judge Lea the case in my presence over the phone, and Judge Lea told me to charge plaintiff with swindling, which I did. In phoning I was trying to get right before I did anything. Plaintiff was not put in jail until I learned from Judge Lea what charge to make against him. I detained plaintiff until the proper complaint could be made, and instructed the Mexican to go to the proper authority and make the complaint. I sent the Mexican to make the complaint, when plaintiff was turned over to the county authorities, but I do not know who made the complaint, when plaintiff's attorney, Mr. Goldstein, came to me and asked me to let plaintiff out on bond or without bond; I told him I had no authority to release plaintiff. I had been advised by the judge of the Police Court, the city attorney, and the mayor, that I had no authority to release plaintiff, and I held plaintiff because I did not think I had authority to release him. In putting plaintiff in jail and handling him on the occasion, I was acting as chief of police of the city of El Paso, Texas, and by authority of my office. I did not know anything about the matter until plaintiff was brought to the station under arrest, and charged with an offense, and then I did not think I had a right to release him, and that is why I held him. No written complaint or warrant was made before plaintiff was delivered to the county authorities, which was about 3 o'clock p. m. I was not present at plaintiff's store when he sold the Mexican the handkerchiefs and changed the money, and did not hear the trade. I did not abuse or mistreat plaintiff in any way whatever, and I had no malice whatever toward him. I did not take plaintiff before a magistrate. The office of the judge of the Corporation Court was in the police station, and the office of Justice Marshall was four blocks from the station, and the

office of Justice Mitchell was six blocks from the station. At the time plaintiff was brought to the police station the officers there were under me and under my direction; I was chief over all of them."

The plaintiff testified as follows: "I am the plaintiff in this cause, and George C. Campbell is one of the defendants, and W. H. Burgess and J. H. Pollard are the other defendants. I am and was at the time of my arrest by James Miller a drygoods merchant on South El Paso Street, city and county of El Paso, Texas, my store being in the main business part of the city and being surrounded by business houses. At the time of my arrest I had five clerks in my store, and I managed the business and sold my goods, and my time was of the value of $10 per day to me. On February 4, 1908, the day of my arrest, James Miller came to my store with a Mexican, about 11 o'clock a. m., and demanded that I take back twelve handkerchiefs which I had sold the Mexican, and give him $24 which the Mexican claimed I had kept for changing his money. I told Mr. Miller that the Mexican had agreed to pay me $24 for the handkerchiefs, and to pay me $20 for changing $280 United States money into Mexican money, two dollars Mexican money for $1 United States money; that I had kept only $20 for changing the money, and refused to take the handkerchiefs and return the $24 paid me for them, and also refused to return the $20 which I charged for making change unless my attorney so advised, and asked time to go and consult my attorney, which said Miller gave me. When I came from my attorney I still refused the demands of the Mexican and said Miller, whereupon said Miller said he would have to take me to the chief of police. I went with said Miller without protest because I knew he was a police officer and I did not want to resist an officer, but I went with him against my will. When we got to the police station in the city of El Paso, Texas, we found defendant, George C. Campbell, who was then chief of police of said city. I told Mr. Campbell that the Mexican had agreed to pay me $24 for the handkerchiefs and to pay me $20 for changing his money. I told Mr. Campbell that I did not know whether or not I had a right to charge for changing money, but that I knew all the other merchants did so, and I supposed I had, and that I had a heavy expense, and had to make money and had a right to get all I could for my goods. I told Mr. Campbell that the handkerchiefs cost from $12 to $18 per dozen. I did not tell him that I had charged too much for the handkerchiefs, or that some of the handkerchiefs were worth only twenty-five cents apiece. When Mr. Campbell had talked over the matter with me and the Mexican he demanded of me to take the handkerchiefs and return the money, which I refused to do. He then said he would put me in the penitentiary and ordered me locked up. I was locked up by order of Mr. Campbell about 12:30 o'clock p. m. I asked the party who locked me up to allow me to phone my attorney and get bond for me and he refused to do so. I was allowed to phone my attorney, Abe Goldstein, about 1 o'clock p. m. Mr. Goldstein came to me at the station and Mr. Campbell was not there, and demanded of the clerk to release me, which he refused to do. Mr. Goldstein then left and returned to the station about 2:30 o'clock

p. m. and asked Mr. Campbell to release me without bond, or on bond, which he refused to do. About 3 o'clock p. m. I was delivered to Deputy Sheriff Greet, to be transferred to the county jail, and he took me to the sheriff's office, where Mr. Goldstein made bond for me and obtained my release. Mr. Campbell did not strike or curse or abuse me or handle me roughly. I suffered great humiliation from being put in jail. I did not have anything to eat while in jail and I became sick. It hurt me to have my friends ask me why I was put in jail, as they did, and to have the local agent of R. G. Dun & Co. ask me why I was put in jail. I paid Mr. Goldstein $25 for obtaining my release, and I think it was a reasonable fee for his services. When I changed the money for the Mexican he was in a hurry to go into Mexico, and the banks were closed. I got the Mexican money from other merchants and had to pay them two percent for it; the Mexican left my store perfectly satisfied. My Mexican clerk made the trade with him."

Mr. Goldstein, the attorney of plaintiff to secure his release, testified that he was called to the police station at 1 p. m. on February 4, 1908, to see plaintiff, and asked the clerk to release him, which he refused to do; that he returned to the station about 2:30 p. m. and found Campbell there and told him that he had no right to hold plaintiff; asked him if he had a complaint, and he said "No;" that he then asked Campbell if any offense had been committed in the presence of an officer entitling him to hold plaintiff, and he replied, not that he knew of; but that he would hold him anyway; that he had committed an offense and he would hold him; and that he, Goldstein, demanded plaintiff's release with or without bond, and he, Campbell, refused to do either.

While Campbell may not be responsible for the original arrest of plaintiff by the policeman, Miller, no one can entertain the slightest doubt about the fact that plaintiff was deprived of his liberty by him after Miller took him from his store to Campbell at the police station. The defendant's own testimony, coming from his own lips, shows this. Was this imprisonment sanctioned or justified by the law? If not, then Campbell was guilty of false imprisonment, and the verdict in his favor is manifestly wrong. For if he was not authorized by the law to imprison Gold, the plaintiff was entitled as a matter of law to damages in some amount.

Title V, chapter one, of the Code of Criminal Procedure, prescribes in what cases arrests may be made without warrant, and then, by article 252, provides that in all cases enumerated in the chapter the person making the arrest shall immediately take the person arrested before the magistrate who may have ordered the arrest, or before the nearest magistrate where the arrest was made without an order.

It is not pleaded, nor is it contended, that the arrest and imprisonment of plaintiff was made or justified under any article of this chapter, unless it is article 249, which is as follows: "The municipal authorities of towns and cities may establish rules authorizing the arrest without warrant of persons found in suspicious places, and under circumstances which reasonably show that such persons

have been guilty of some felony or breach of the peace, or threaten or are about to commit some offense against the laws."

The ordinance establishing a rule authorizing an arrest without a warrant by the municipal authorities of the city of El Paso, which is pleaded by defendants in justification of the arrest, is No. 561, which is as follows:

"General Duties and Powers of Police Officers.—The chief of police and the policemen of this city shall at all times preserve order, peace and quiet throughout the city, and shall vigilantly guard and protect the inhabitants and property of the city. They shall, with or without warrant, arrest all persons found in the act of violating any law or ordinance; they shall arrest all persons found under suspicious circumstances, and shall take every person arrested by them, if in the daytime, before the proper judicial tribunal, and if in the night-time to the city prison or other place of security within the city, and there confine the party so arrested until they can be brought before the proper tribunal for trial. The policemen of this city shall have authority to break open and enter any house, tenement, enclosure, or other place where any person may take refuge or be, to arrest such person who has in their presence or hearing been guilty of any crime or breach of the peace, or when a breach of the peace or crime has been, is being, or is about to be committed, or any law or ordinance has been, is being, or is about to be violated, and arrest the offenders."

In view of the undisputed facts it is apparent that the arrest and detention of the plaintiff was not authorized by this ordinance and can not be justified by it. The plaintiff was not found in the act of violating any Act or ordinance; nor was plaintiff found in suspicious places, or "under suspicious circumstances," but at his own store in pursuit of his legitimate business. It is equally apparent that plaintiff was not detained in any of the cases or for any of the purposes mentioned in article 593 of the Penal Code.

The long and short of the whole matter is that plaintiff was arrested by Miller upon the verbal statement of a Mexican, which simply showed that he rued a trade he had made with plaintiff and wanted back the purchase money he had paid for a dozen handkerchiefs he had bought from the plaintiff, because he would not, on the demand of the officer, take back the handkerchiefs and return the Mexican the money he paid for them. No fraud on the part of plaintiff was charged, nor does the evidence indicate any, in the transaction. It was simply a matter of bargain and sale in which plaintiff had the right to ask what he pleased for his goods and receive as much for them as a purchaser was willing to pay. Things have come to a pretty pass in this country, when a policeman can constitute himself a judge of the fairness of a business transaction and deprive a citizen of his liberty because a sale is not cancelled at his bidding. What are our constitutional guaranties of the right of enjoyment of liberty and property worth, if an outrage of this character is to receive the sanction of our courts? The question answers itself.

Having been informed of this illegal arrest when plaintiff was

brought before him, instead of arresting Miller for the offense of false imprisonment, which was committed in his presence, the defendant, Campbell, sanctioned the commission of the offense by undertaking himself to force plaintiff to take back the handkerchiefs and return to the Mexican the purchase money he had received for them; and because he wouldn't, placed him in jail and locked him up there. The law does not, can not, and never will, unless the natural rights of man are lost and become but a theory or a dream, justify such conduct in one of its officers or anyone else.

The verdict as to Campbell is not only contrary to the overwhelming weight of the testimony, but without a particle of evidence to support it. Indeed, the imprisonment being shown by the undisputed evidence, and there being nothing proved that tended in the least to justify it, there was no issue as to the fact of false imprisonment to be submitted as to such defendant, and the court should have peremptorily instructed the jury to find against such defendant as to such matter, and have submitted to the jury only the question of how much damages were sustained by plaintiff by reason of such false imprisonment. And should the evidence upon another trial be in effect such as that now before us, the court below is directed to so instruct the jury.

Now, as to the question of the measure of damages. This will embrace the consideration of a number of the assignments. Some damages are always presumed to follow from the violation of any right or duty implied by law; and therefore the law will, in such cases, award nominal damages if none greater are proved. Hence, in this case, the plaintiff's right to the enjoyment of his liberty having been violated by the defendant Campbell, he is entitled to recover from him at least nominal damages. He is also entitled to recover the expenses reasonably incurred to procure his discharge from the restraint, for loss of time, interruption of his business, and suffering, bodily and mental, such as the wrongful imprisonment may have occasioned him. The imprisonment being unlawful, it is not necessary to prove malice, it being conclusively imputed from the unlawful act of the defendant. And in cases of this character, where there is no possible way of measuring the general damages with any certainty, the sound discretion of the jury under all the circumstances is the only measure practicable (3 Sutherland on Dam., sec. 1257); and if the defendant, in committing the wrong complained of, acted recklessly, or wilfully and maliciously, with a design to oppress and injure the plaintiff (which are matters for the jury to determine), the jury in fixing the damages may disregard the rule of compensation, and beyond that may, as a punishment of the defendant and as a protection to society against the violation of personal rights and social order, award such additional exemplary damages as they may deem proper. (Sedg. on Dam., sec. 352.) Wherefore, the court erred in instructing the jury that they could not find exemplary damages against the defendant Campbell. We think, however, damages to plaintiff's business, not being such as would naturally and proximately arise from the wrong done his person, are too remote for recovery, and that therefore the court did

not err in sustaining the exception of defendants to that part of plaintiff's petition which alleges such damages.

As the arrest of the plaintiff was without complaint or warrant and unjustifiable under the undisputed facts, the complaint, information and warrant of arrest filed and issued after his false imprisonment, it being indisputably shown that he was not held in custody after the warrant was issued, were not evidence tending to justify or mitigate such unlawful act and should not have been admitted in evidence over plaintiff's objections thereto. Even the liability of an officer for an illegal arrest is not waived by the plaintiff's pleading guilty of the offense for which the arrest was made. (McCullough v. Greenfield, 133 Mich., 463, 95 N. W., 532.)

Now, as to the liability of Campbell's sureties on his official bond for the false imprisonment of plaintiff. For all defaults of a public officer within the limit of what the law authorizes or enjoins upon him as such officer, the sureties on his official bond are liable; but they are not bound for acts which are not done in his official capacity. As is said, "The authorities recognize a principle or rule by which the acts of the sheriff, for which his sureties may be held liable, can be distinguished from those acts for which they will not be held liable. The former are termed acts done *virtute officii,* and the latter *colore officii.* The distinction is this: Acts done *virtute officii* are when they are within the authority of the officer, but when doing them he exercises that authority improperly, or abuses the confidence which the law reposes in him; whilst acts done *colore officii* are where they are of such nature the office gives him no authority to do them." (Leger v. Warren, 51 L. R. A., 222.)

Under this principle, it is held in this State that to charge the sureties on a sheriff's bond, the act complained of must not only be such as might be rightfully done by the sheriff as such, but was actually done by him as sheriff under a claim of right to do it in his official capacity. (Heidenheimer v. Brent, 59 Texas, 533; Maddox v. Hudgeons, 31 Texas Civ. App., 291.) In view of what we have said in regard to the wrongful imprisonment, it is apparent from the authorities cited that the sureties on his official bond are not liable. For a case where sureties were held liable because the acts were done *virtute officii,* see King v. Brown, 100 Texas, 109.

The judgment in favor of the sureties on defendant Campbell's bond is affirmed, and the judgment in favor of Campbell is reversed and the cause as to him remanded to be tried in accordance with this opinion.

*Affirmed in part and reversed and remanded in part.*