MEMORANDUM AND OPINION
 

 ROSENTHAL, District Judge.
 

 Pending before this court is a motion and an amended motion for summary judgment filed by defendant Huntsville Independent School District (“Huntsville ISD”) (Docket Entry Nos. 10 and 26). Plaintiffs, Franklin P. Favero, Sr. (“Favero Sr.”) and Franklin P. Favero, Jr. (“Favero Jr.”) have filed detailed responses.
 

 The parties include in their submissions the results of discovery conducted in this case, including deposition testimony and responses to written discovery requests.
 
 [1]
 
 Based on a careful review of the pleadings, motions, the summary judgment record, and the applicable law, this court GRANTS the motion for summary judgment, for the reasons stated below.
 

 I. Background
 

 Plaintiff Favero Sr. worked for the Huntsville ISD as a substitute bus driver from October 26, 1990 to September 30, 1994. Plaintiff Favero Jr. worked as a full-time bus driver from January 25, 1993 to September 30,1994. Both plaintiffs are members of the Worldwide Church of God. Their religious beliefs require them to abstain from work to observe the weekly Sabbath, from sunset Friday to sunset Saturday, and to observe certain annual feasts, including the Feast of Atonement and the Feast of Tabernacles. The Feast of Tabernacles occurs in the fall of each year and requires participants to meet in a designated city with other church members for approximately ten days. To attend the Feast of Tabernacles, plaintiffs require a leave of absence from work for five to eight consecutive work days. The number of consecutive work days missed depends on which day of the week the Feast of Tabernacles begins and on the travel time required.
 

 It is undisputed that when plaintiffs applied to Huntsville ISD to work as bus drivers, they notified Edwin Garner (“Garner”), the transportation coordinator, that their religion required them to observe holy days. There is a dispute as to Garner’s response. Plaintiffs assert that Garner “guaranteed” that they would be allowed leave from work to attend the Feasts and observe the religious holidays, and that the school district merely required “a week or two” advance notice. (Docket Entry No. 12, Favero Sr. Affidavit). Gamer asserts that when plaintiffs said that they would need time off for religious holidays, he “told them that if [he] could accommodate them, [he] would.” (Docket Entry No. 26, Exhibit C, Garner Affidavit, p. 4).
 

 It is undisputed that until September 19, 1994, Huntsville ISD gave plaintiffs unpaid leaves of absence for religious observances when plaintiffs requested. There is some dispute as to the precise number of days that plaintiffs took for religious reasons before September 1994. However, it is undisputed that Huntsville ISD granted every day of leave plaintiffs requested. Favero Sr. requested and received leaves of absence for religious purposes, including five to seven consecutive working days off to attend the Feast of Tabernacles, in 1991 and 1992. Both Favero Sr. and Jr. received such leaves in 1993.
 
 [2]
 

 
 *1285
 
 In August 1994, plaintiffs requested leaves of absence from September 19-28
 
 [3]
 
 , to attend the Feast of Tabernacles observance in Corpus Christi, Texas. Plaintiffs assert that Steven Schultz (“Schultz”), the fleet supervisor, granted the requested leave. Huntsville ISD asserts that Schultz told plaintiffs that their leave would probably be granted but that approval was conditioned on the availability of substitute drivers to cover plaintiffs’ routes.
 

 On September 14, 1994, Gamer and Schultz told plaintiffs that because of the shortage of bus drivers, the requested leave could not be granted. This announcement was followed by an angry exchange between plaintiffs and Gamer. Plaintiffs assert that at the end of the meeting, Gamer fired them. Gamer denies that he terminated plaintiffs, but admits that he ordered them to turn in their badges and clean their mailboxes. The district admits that plaintiffs may have been “under the impression” that their employment was over.
 

 Plaintiffs did not report to work for their afternoon bus routes on September 14, 1994. Plaintiffs assert they did not drive that afternoon’s shift because they had been terminated. Huntsville ISD asserts that because plaintiffs were not excused from work on that date, Schultz invalidated their employee identification numbers. (Docket Entry No. 26, Exhibit D).
 

 Plaintiffs had previously been approved for religious absences on September 15 and did not report to work. On September 16, 1994, plaintiffs spoke by telephone to Sally- Cray-craft (“Craycraft”), director of personnel for the district. Craycraft told plaintiffs that they were not fired. Craycraft also told plaintiffs that they would receive the first five days of their requested leave, but that due to the shortage of bus drivers, the second week of their requested leave was denied and they were required to return to work on September 26, 1994. (Docket Entry No. 12, Affidavits). Favero Sr. told Craycraft that they would not be back to work until September 29,1994.
 

 On September 19,1994, plaintiffs left separately for Corpus Christi. On September 20, 1994, Craycraft and Gamer sent plaintiffs letters, reiterating that their requests for leave had been granted for the first five days. (Docket Entry No. 10, September 20, 1994 letter, Exhibit A-3; B-l). The letters informed plaintiffs that if they did not return at the end of their granted leave, their employment “could [be] adversely affect[ed].” Plaintiffs assert that they did not receive these letters until September 28, 1994, when they returned from Corpus Christi. (Docket Entry No. 12, Affidavits).
 

 On September 29, 1994, plaintiffs reported to work. They were not permitted to drive their routes and were told that they were on suspension with pay until a disciplinary hearing on September 30, 1994. At that hearing, plaintiffs were given letters dated September 29, 1994, stating that they were terminated as of September 30, 1994. (Docket Entry No. 12, Affidavits).
 

 Plaintiffs timely filed charges of religious discrimination with the EEOC on December 2, 1994 and January 1, 1995, and filed this suit on June 28, 1995. Plaintiffs assert claims under Title VII, 42 U.S.C. § 2000e(j); breach of contract and promissory estoppel; and Article I, § 6 of the Texas constitution. Defendant seeks summary judgment as to all claims.
 

 
 *1286
 
 II. Title VII: Reasonable Accommodation and Undue Burden
 

 Title VII of the Civil Rights Act of 1964, as amended, prohibits an employer from discriminating against an employee on the basis of “race, color, religion, sex, or national origin.” 42 U.S.C. § 2000e-2(a)(l). The statute defines “religion” to include “all aspects of religious observance and practice, as well as belief.” 42 U.S.C. § 2000e(j). “The employer violates the statute unless ‘it demonstrates that [it] is unable to reasonably accommodate ... an employee’s ... religious observance or practice without undue hardship on the conduct of the employer’s business.’ ”
 
 Beadle v. City of Tampa,
 
 42 F.3d 633, 636 (11th Cir.1995),
 
 cert. denied,
 
 - U.S. -, 115 S.Ct. 2600, 132 L.Ed.2d 846 (1995),
 
 citing Ansonia Bd. of Educ. v. Philbrook,
 
 479 U.S. 60, 68-70, 107 S.Ct. 367, 372, 93 L.Ed.2d 305 (1986).
 

 The employee’s
 
 prima facie
 
 case is established by showing that: he holds a sincere religious belief that conflicts with an employment requirement; he has informed his employer of the conflict; and he was discharged or disciplined for failing to comply with the conflicting requirement.
 
 Cooper v. Oak Rubber Co.,
 
 15 F.3d 1375, 1378 (6th Cir.1994) (citations omitted). Once a
 
 prima facie
 
 case is established, the burden shifts to the employer to show that it could not reasonably accommodate the employee without undue hardship.
 
 Id.
 
 The reasonableness of an employer’s attempt to accommodate is determined on a case-by-ease basis. If the employer’s efforts fail to eliminate the employee’s religious conflict, the burden remains on the employer to establish that it is unable reasonably to accommodate the employee’s beliefs without incurring undue hardship.
 
 Id.
 
 To require an employer to bear more than a
 
 de minimis
 
 cost in order to accommodate an employee’s religious beliefs is an undue hardship.
 
 Id., citing Trans World Airlines, Inc. v. Hardison,
 
 432 U.S. 63, 84-86, 97 S.Ct. 2264, 2277, 53 L.Ed.2d 113 (1977).
 

 Plaintiffs have shown a
 
 prima facie
 
 case of religious discrimination. The burden shifts to Huntsville ISD to show that it could not reasonably accommodate plaintiffs, without undue hardship.
 

 A. Reasonable Accommodation
 

 The Fifth Circuit has explained that the range of acceptable accommodation under Title VII moderates the conflicting interests of both the employee and the employer: 1) it protects the employee by requiring that the accommodation offered be “reasonable”; and 2) it protects the employer by not requiring any accommodation which would impose an “undue hardship.”
 
 EEOC v. Universal Mfg. Corp.,
 
 914 F.2d 71 (5th Cir.1990),
 
 citing Ansonia Board of Education v. Philbrook,
 
 479 U.S. at 66-68, 107 S.Ct. at 371. Once an employer demonstrates that it reasonably accommodated an employee’s religious needs, the statutory inquiry ends.
 
 Ansonia,
 
 479 U.S. at 66-70, 107 S.Ct. at 371-72. “[T]he extent of undue hardship on the employer’s business is at issue only where the employer claims that it is unable to offer any reasonable accommodation without such hardship.”
 
 Id.
 
 at 68-69, 107 S.Ct. at 372.
 

 “[E]aeh case necessarily depends upon its own facts and circumstances, and in a sense every case boils down to a determination as to whether the employer has acted reasonably.”
 
 Beadle v. City of Tampa,
 
 42 F.3d at 636,
 
 quoting United States v. City of Albuquerque,
 
 545 F.2d 110, 114 (10th Cir.1976),
 
 cert. denied,
 
 433 U.S. 909, 97 S.Ct. 2974, 53 L.Ed.2d 1092 (1977).
 

 The district argues that because it went to “extraordinary lengths” over several years to accommodate plaintiffs’ religious beliefs, it made a reasonable accommodation as a matter of law. The district emphasizes the undisputed fact that before the request at issue, plaintiffs had received every leave of absence they had requested, including at least one day off earlier in September 1994, the same month that they requested the additional, consecutive eight days off. Huntsville ISD cites
 
 Brener v. Diagnostic Center Hospital,
 
 671 F.2d 141 (5th Cir.1982), to support its argument that in reviewing the efforts to accommodate plaintiffs’ religious beliefs, this court must look not only at the latest request for leave, but at the history of the employer’s prior accommodations.
 

 
 *1287
 

 Brener
 
 involved a pharmacist whose religious beliefs required that he not work from sundown Friday to sundown Saturday. Plaintiff claimed that his employer had failed to accommodate his religious needs by failing to arrange for other employees to cover the weekend shifts. The Fifth Circuit held that the plaintiff was precluded from arguing that he had not been accommodated because he did not “fully explore” the options presented to him for accommodation. In reaching this conclusion, the court examined the defendant employer’s ongoing efforts to accommodate the plaintiff, including efforts to arrange for other pharmacists to cover plaintiffs shifts.
 

 The plaintiff in
 
 Brener
 
 had made inadequate efforts to cooperate with the defendant employer in reaching a reasonable accommodation.
 
 Brener
 
 made it clear, however, that employees have no burden to modify their religious beliefs.
 
 Brener,
 
 671 F.2d at 146.
 

 This court agrees that the district’s, and the plaintiffs’, history of bilateral cooperation during plaintiffs’ employment is relevant. However, in
 
 Brener
 
 and other cases cited by Huntsville ISD, the employer offered some option which allowed the employees to satisfy their religious obligations.
 
 Id.
 
 at 145;
 
 see also Chrysler Corp. v. Mann,
 
 561 F.2d 1282 (8th Cir.1977),
 
 cert. denied,
 
 434 U.S. 1039, 98 S.Ct. 778, 54 L.Ed.2d 788 (1978) (the plaintiff could have availed himself of his employer’s leave of absence procedure or used his paid excused absences, either one of which would have satisfied his religious needs);
 
 United States v. City of Albuquerque,
 
 545 F.2d 110 (10th Cir.1976),
 
 cert. denied,
 
 433 U.S. 909, 97 S.Ct. 2974, 53 L.Ed.2d 1092 (1977) (the employer’s scheduling system permitted employees to trade shifts, which would have allowed the plaintiff to fulfill his religious obligation, but the employee made no attempt to do so).
 

 In contrast to the facts in these cases, the Faveros did not fail to cooperate with Huntsville ISD. In
 
 Brener,
 
 the issue was whether the plaintiffs religious needs could be reasonably accommodated by trading or reassigning shifts to avoid requiring plaintiff to work when his religion required him to abstain. In the present ease, all bus drivers must drive at the same times, every school day. Unlike the employee in
 
 Brener,
 
 plaintiffs could not trade shifts or hours with other employees. Plaintiffs’ cooperation could only take the form of giving ample notice of the need for certain days off for religious reasons, which plaintiffs did.
 

 The district argues that because plaintiffs were given the first five days of the requested leave and denied only the last three days, their religious needs were reasonably accommodated. This argument ignores the holdings in several circuits that a reasonable accommodation is one that
 
 eliminates
 
 the employee’s conflict between his religious practices and work requirements.
 
 Cooper v. Oak Rubber Co.,
 
 15 F.3d at 1380;
 
 Wright v. Runyon,
 
 2 F.3d 214, 217 (7th Cir.1993),
 
 cert. denied,
 
 510 U.S. 1121, 114 S.Ct. 1077, 127 L.Ed.2d 394 (1994).
 

 In
 
 EEOC v. Universal Mfg. Corp.,
 
 the plaintiff, a member of the Worldwide Church of God, requested seven days unpaid leave to attend the Feast of Tabernacles. The employer offered the employee a choice between five working days off or seven days off if she worked one shift within that seven days. The employee informed the employer that she would take the seven days off but that she could not work a shift during that time because it would violate her religion’s prohibition against working during the holiday. When the employee took seven days off, she was terminated.
 

 The district court granted summary judgment in favor of the employer, finding that the employer’s offer constituted a reasonable accommodation as a matter of law. The Fifth Circuit reversed, stating as follows:
 

 The Supreme Court has never held that the question of “reasonable” accommodation focuses upon the number of conflicts or even upon the proportion of a single conflict eliminated by the employer’s offer of accommodation. True, the Court has stated that “absolute accommodation” is not required. The employee, for example, cannot have his cake and eat it too. That is what the
 
 Ansonia
 
 Court denied an employee who insisted upon additional paid personal leave for religious purposes, when his employer effectively permitted unpaid leave. Generally accepting either solution
 
 *1288
 
 as reasonable, the Court merely relegated the choice between alternative forms of reasonable accommodation to the employer rather than to the employee. The
 
 Ansonia
 
 Court did not leave the employer free to choose an unreasonable form of accommodation over a reasonable one.
 

 914 F.2d at 73-74.
 
 [4]
 
 A similar result was reached in
 
 Cooper v. Oak Rubber Co.,
 
 in which the court found that the employer did not reasonably accommodate the plaintiff when it accommodated one of her religious practices but failed to address her principal objection to working on Saturday. “An employer does not fulfill its obligation to reasonably accommodate a religious belief when it is confronted with two religious objections and offers an accommodation which completely ignores one.” 15 F.3d at 1379,
 
 citing EEOC v. University of Detroit,
 
 904 F.2d 331, 335 (6th Cir.1990).
 

 The district has failed to demonstrate that, as a matter of law, it provided plaintiffs with a reasonable accommodation. The accommodation offered by Huntsville ISD required plaintiffs to work during the Feast of Tabernacles, violating their religious beliefs. The fact that the district had granted prior leaves does not make its refusal to grant the last leave requested reasonable. Nor does the fact that the district granted part of the requested leave make the accommodation offered reasonable. It is undisputed that plaintiffs’ religious obligation was to attend the entire Feast of Tabernacles and abstain from work during that time. It is undisputed that they could not fully satisfy their religious observance by taking five out of eight days of unpaid leave.
 

 This finding, however, does not end the court’s inquiry. Huntsville ISD may avoid liability for discrimination by showing that accommodating plaintiffs’ religious needs would have caused an undue hardship.
 

 B. Undue Hardship
 

 An employer has a “statutory obligation to make reasonable accommodation for the religious observances of its employees, short of incurring an undue hardship.”
 
 Hardison,
 
 432 U.S. at 75, 97 S.Ct. at 2272. To require an employer “to bear more than a
 
 de minimis
 
 cost in order to [accommodate an employee’s religious beliefs] is an undue hardship.”
 
 Id.
 
 at 84, 97 S.Ct. at 2277. Reasonable accommodation does not mean that “an employer must deny the shift and job preferences of some employees ... in order to accommodate or prefer the religious needs of others.”
 
 Id.
 
 at 64, 97 S.Ct. at 2267. “Any cost in efficiency or wage expenditure that is more than
 
 de minimis
 
 constitutes undue hardship.”
 
 Lee v. ABF Freight System, Inc.,
 
 22 F.3d 1019, 1023 (10th Cir.1994),
 
 citing Mann v. Frank,
 
 7 F.3d 1365, 1370 (8th Cir. 1993). “The cost of hiring an additional worker or the loss of production that results from not replacing a worker who is unavailable due. to a religious conflict can amount to undue hardship.”
 
 Lee v. ABF Freight System, Inc.,
 
 22 F.3d at 1023,
 
 citing Hardison,
 
 432 U.S. at 84-86, 97 S.Ct. at 2277.
 

 Huntsville ISD relies primarily on two cases to support its argument that to grant plaintiffs’ requested leave in full would result in an undue hardship as a matter of law. In
 
 Trans World Airlines, Inc. v. Hardison,
 
 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977), the plaintiff was employed by TWA in a maintenance and overhaul department that operated 24 hours per day, 365 days per year. TWA was subject to a collective bargaining agreement that regulated how employees were allowed to bid for their work schedules. The plaintiff, a member of the Worldwide Church of God, told his supervisors that he could not work from sunset on Friday to sunset on Saturday. TWA aecom
 
 *1289
 
 modated the plaintiff until the plaintiff requested and received a transfer to a new department. After the transfer, the plaintiff lost his seniority and was assigned to the Saturday crew. The union was unwilling to alter its seniority system to accommodate the plaintiff. The plaintiff proposed that: he work four-day weeks; either a supervisor or an employee from another department cover plaintiffs assignments on Saturdays; or TWA hire someone not regularly assigned to Saturdays to cover his assignment.
 
 Id.
 
 at 68-70, 97 S.Ct. at 2269.
 

 The Court rejected these proposed accommodations as imposing an undue hardship, or a more than
 
 de minimis
 
 cost, on the employer, stating as follows:
 

 [Tjhese alternatives would involve costs to TWA, either in the form of lost efficiency in other jobs or higher wages.
 

 Id.
 
 at 84, 97 S.Ct. at 2277.
 

 In
 
 Lee v. ABF Freight System, Inc.,
 
 the plaintiff was a truck driver who could not work from sundown Friday to sundown Saturday for religious reasons. The plaintiff was terminated after he was assigned several truck runs on Fridays and was unavailable for work. The plaintiff suggested that ABF hire outside drivers to cover his Friday/Saturday runs. The Tenth Circuit held that bringing in an outside driver or allowing the plaintiffs position to go uncovered would impose an undue hardship on ABF, either through higher wages or a loss in efficiency. 22 F.3d at 1023-24. The court noted that “[ajny cost in efficiency or wage expenditure that is more than
 
 de minimis
 
 constitutes undue hardship.”
 
 Id.,
 
 22 F.3d at 1023,
 
 citing Mann v. Frank,
 
 7 F.3d 1365, 1370 (8th Cir. 1993);
 
 see also Eversley v. MBank of Dallas,
 
 843 F.2d 172, 176 (5th Cir.1988) (requiring other employees to switch work assignments to cover for the plaintiff imposed an undue burden on the employer);
 
 Beadle v. City of Tampa,
 
 42 F.3d 633 (11th Cir.1995) (requiring the police department to grant shift exceptions would result in a greater than
 
 de minimis
 
 cost because of the public health, safety, and welfare considerations associated with police work).
 
 Id.
 
 at 635.
 

 Plaintiffs rely primarily on
 
 Willey v. Maben Mfg., Inc,
 
 479 F.Supp. 634 (N.D.Miss. 1979), to support their argument. In
 
 Willey,
 
 plaintiffs were members of the Worldwide Church of God who requested a leave of absence in order to attend the Feast of Tabernacles. When plaintiffs applied for employment they informed their employer of their need to attend the Feast of Tabernacles each year.
 
 Id.
 
 at 634-35. The court dismissed the employer’s argument of undue hardship, even though eight production days were lost at a cost of $30,000, due to plaintiffs’ absence. Although management had ample notice that the plaintiffs expected to be off from work to attend the Feast of Tabernacles, the employer had made little effort to use replacement workers. Because the “undue hardship” could have been avoided if the employer had prepared for the plaintiffs absence, the employer had violated Title VII.
 
 Id.
 

 Plaintiffs argue that, as in
 
 Willey,
 
 any hardship was caused by the district, and an employer cannot rely on a self-created hardship.
 
 Willey,
 
 however, does not stand for such a broad rule. The sole issue in that ease was whether the employer had been given sufficient notice of the plaintiffs’ impending absence to enable • it to schedule replacements.
 
 Id.
 
 at 637. The employer had ample notice and admitted that it could have scheduled replacements to grant the leave without undue hardship.
 
 Id.
 
 The “manufacturing” of the hardship in Willey came from the fact that the manufacturer had advance notice of the employee’s need for time off; could have used the time to find a replacement; and, having failed to do so, could not use the hardship it could have easily avoided as the basis for refusal. Recent cases have noted the limited nature of the
 
 Willey
 
 holding.
 
 See Bennett v. Monon Trailer Corp.,
 
 631 F.Supp. 724, 730 (N.D.Ind. 1985),
 
 affd
 
 789 F.2d 919 (7th Cir.1986) (“[i]n
 
 Willey
 
 the issue was a narrow one of the timeliness of notice, an issue not present here”).
 

 The timeliness of notice is not an issue in the present case. The issue is whether there are disputed facts material to determining if Huntsville ISD could have granted plaintiffs eight days leave without more than a
 
 de minimis
 
 burden.
 

 
 *1290
 
 It is undisputed that the district suffered a chronic shortage of bus drivers during the relevant time period, including September 1994. Huntsville ISD has submitted competent summary judgment evidence that in September 1994, the district had 46 regular drivers, 9 teaeher/drivers, 9 college student drivers, and 2 part-time drivers, for a total of 65 full-time drivers. The district had 6 supervisors who had bus drivers’ licenses, but whose regular job duties did not include driving buses. In September 1994, Huntsville ISD needed 70 drivers to operate its bus routes. Before any unscheduled absences, and assuming that every driver, college student, and teacher/driver appeared for work as scheduled, Huntsville ISD was operating with 5 drivers fewer than required. (Docket Entry No. 35, pp. 2-5 and Exhibits B, C, D, and E).
 

 During this time period, the district had 7 substitute drivers, including Favero Sr. However, the district has provided summary judgment evidence that every day, on average, 3 drivers were absent for the entire day and almost 6 drivers were absent for some part of the day. Because the buses are driven at fixed times, an absence during part of a day often meant that no driver was available to cover a route. On no day were there less than 2 unscheduled absences.
 
 (Id.,
 
 Exhibits F, G). During the month of September 1994, the district had 65 drivers to fill 70 required positions, with 7 substitutes, and with between 2 to 6 unscheduled absences each day. With both plaintiffs gone, the actual daily shortage would be 7 drivers, to be covered by 7 substitutes — but with no substitutes available to cover the 2 to 6 additional unscheduled but routine absences.
 

 Huntsville ISD argues that it granted plaintiffs’ leave of absence for five days instead of eight because, given the undisputed shortage of bus drivers, eight days was too long for other employees to cover for plaintiffs’ absence instead of performing their regular jobs. “The District had determined that for the first five days of the leave requested by Plaintiffs, there would be sufficient drivers available to accommodate the needs of the transportation department____ During the last ... days of the leave requested by Plaintiffs, however, there would not be sufficient drivers available to the Department, so that granting the leave would have caused an undue hardship on the operation of the Department.” (Docket Entry No. 10, p. 3).
 

 Huntsville ISD has submitted summary judgment evidence showing that in the second week of the plaintiffs’ absence, unlike the first, several other drivers besides the plaintiffs had scheduled absences in advance. (Docket Entry No. 10, Schultz Affidavit). The district argues that with both plaintiffs gone, the severe driver shortage made covering plaintiffs’ bus routes for more than five consecutive days an undue hardship, particularly given the additional scheduled absences in the second week.
 

 Huntsville ISD argues that it in fact suffered undue hardship because of plaintiffs’ absence. “Because of the Faveros’ absence, several buses were seriously delayed while [Garner] and his staff tried to combine some routes to make up for the lack of drivers____ In addition, the District was seriously shorthanded in supervising the central depot, because persons who would normally supervise the students were driving buses.” (Docket Entry No. 10, p. 6; Docket Entry No. 26, p. 6 and Exhibit C). The district “went from three (3) on-call mechanics to two, because one of them [was] driving [a bus]. If [there had been] more than one breakdown, the District would have had a bus load of children sitting on the side of the road.” (Docket Entry No. 10, exhibit B).
 

 Plaintiffs assert that the shortage of drivers was “business as usual” caused by Huntsville ISD’s unwillingness to pay enough to retain drivers, and that there were other employees, including mechanics, secretaries, and supervisors, who had bus licenses and who could and did drive when the “usual” shortage required it. Plaintiffs argue that Huntsville ISD cannot rely on a “shortage of drivers” argument because this undisputed shortage was not an “unforeseen crises [sic] beyond [Huntsville ISD’s] control,” but a chronic problem caused by the district’s refusal to pay drivers more money. (Docket Entry No. 12, p. 21).
 

 
 *1291
 
 The material facts as to the number and identities of individual qualified and available to drive during plaintiffs’ requested absence are undisputed. The parties dispute whether the facts show, as a matter of law, that the district could not reasonably accommodate plaintiffs’ religious observance, without undue burden.
 

 1. Hire More Drivers and Pay Drivers More
 

 Plaintiffs argue that the district should have hired more drivers to cure the driver shortage, and paid them to reduce the attrition rate, rather than deny plaintiffs’ right to religious observance. The facts as to the district’s efforts to hire new drivers and the financial constraints under which it operated, are set out in the summary judgment record.
 

 Texas law requires that a school bus driver be certified by the Department of Public Safety. Tex.Educ.Code § 34.007(b). The evidence shows that during September 1994, the district was training nine new recruits. (Docket Entry No. 35, Exhibit B). The district hired two new drivers, David Espinosa and Jim Voulgaris, on September 26, 1994.
 
 (Id.).
 
 However, it takes four to six weeks to train a bus driver from the time he or she applies.
 
 (Id.,
 
 Exhibit A, Gamer Deposition, p. 39). Assuming that the plaintiffs made their request for leave on August 22, 1994, it would have been impossible to have trained new bus drivers to take their place in time.
 
 See DePriest v. Department of Human Services of the State of Tennessee,
 
 1987 WL 44454, *3 (“[t]he plaintiff’s supervisors testified that it would probably have taken two weeks to train someone to perform the plaintiffs duties. We agree with the district court that this would have constituted more than a
 
 de minimis
 
 burden.”).
 

 The evidence as to the district’s efforts to hire new bus drivers is in the record. (Docket Entry No. 35, Exhibit J, Craycraft Deposition, pp. 24-26, and Exhibit K). The undisputed evidence showed that Huntsville ISD had great difficulty in hiring and retaining drivers, primarily because it pays much less than other employers in the Huntsville area, particularly the Texas Department of Criminal Justice (“TDCJ”).
 

 Plaintiffs argue that the district should raise its salaries to attract more drivers. The courts have repeatedly held that paying additional wages to accomplish an accommodation, is an undue burden. See,
 
 e.g., Hardison,
 
 432 U.S. at 84-86, 97 S.Ct. at 2277;
 
 Lee v. ABF Freight System, Inc.,
 
 22. F.3d at 1023. The evidence also showed that the financial impact would be more than
 
 de minimis.
 
 Most bus drivers that apply to Huntsville- ISD also apply to work
 
 for the
 
 TDCJ. Bus drivers at TDCJ earn starting salaries of approximately $1500 per month; starting salaries for bus drivers at Huntsville ISD begin at approximately $400 per month. (Docket Entry No. 30, Garner Deposition, pp. 29-30). Increasing the salaries of an entire department to compete with the TDCJ would be an undue burden as a matter of law.
 

 Plaintiffs suggest that because the district is a government employer, with annual expenditures in 1994/95 of over $26 million, it has offered no adequate reason for why it cannot pay its bus drivers more. Plaintiffs’ own evidence shows that in the previous year, the district had suffered a budget deficit of over $6 million. (Docket Entry No. 30, Exhibit B). Hiring more drivers at higher salaries constitutes more than a
 
 de minimis
 
 burden, as a matter of law.
 
 Hardison,
 
 432 U.S. at 84-86, 97 S.Ct. at 2277;
 
 Lee v. ABF Freight System, Inc.,
 
 22 F.3d at 1023.
 

 2. A Shortage, But Not an Undue Hardship
 

 Plaintiffs argue that there was no undue hardship caused by their absence because the district was not required to take any “unusual” steps to cover for absent drivers during the second week.
 

 Plaintiffs argue that two secretaries were licensed bus drivers who could have been used to drive buses in addition to the supervisors, Gamer (the transportation coordinator) and Schultz (the fleet supervisor). Plaintiffs assert that the district’s failure to use these allegedly available drivers raises a fact issue as to, whether plaintiffs’ absence for eight days created undue hardship. The only such employees that plaintiffs identify
 
 *1292
 
 are secretaries named “Stephanie” and “Gail.” The record reveals that the only “Stephanie” and “Gail” in the department, Stephanie Ziober and Gail Thompson, were in fact substitute drivers. (Docket Entry No. 35, Exhibit B). The substitute driver sheets show that both drove frequently during plaintiffs’ absence.
 
 [5]
 
 According to the undisputed evidence in the record, there were no other available regular or substitute bus drivers who did not drive during plaintiffs’ absence.
 

 Plaintiffs point to deposition testimony that one substitute driver drove two routes on September 26; no one from management, or administration, or a mechanic or anyone else who does not drive for “ordinary” absences, drove on September 27,1994; and on September 28, when one bus was left on the dock and a route had to be doubled up, Schultz, a supervisor, was available to drive but did not. (Docket Entry No. 30, p. 24, and Schultz Deposition, pp. 35-37). Plaintiffs assert that because supervisors routinely drove to cover for absent drivers, it was not an undue hardship to require supervisors to cover eight days of plaintiffs’ leave of absence.
 

 It is undisputed that if supervisors or mechanics drive, their regular job responsibilities are not performed. Plaintiffs’ request for eight consecutive days off was during a period of chronic shortage, in which supervisors were already required to spend significant time driving to cover for unscheduled absentees, during which these supervisors could not perform all their regular job duties. The fact that supervisors had driven in the past does not change the fact that having the two plaintiffs gone for eight consecutive days meant that two more supervisors or other employees would have to drive, instead of performing their regular jobs.
 

 Plaintiffs argue that a fact issue is raised because Schultz, the fleet supervisor, took two days of vacation on September 26 and 27, 1994. Even had Schultz been in the district those days, he was not supposed to be driving the buses because he is a supervisor. The undisputed evidence also shows that Schultz made his request for vacation in July 1994, while plaintiffs made their initial request in August 1994. (Docket Entry No. 35, Exhibit A, pp. 54-55). The applicable legal standard forbids forcing one employee to give up vacation to accommodate another employee’s requested religious leave.
 
 Hardison,
 
 432 U.S. at 85, 97 S.Ct. at 2277 (“we will not readily construe the statute to require an employer to discriminate against some employees in order to enable others to observe their Sabbath”);
 
 Eversley v. MBank of Dallas,
 
 843 F.2d at 176.
 

 Plaintiffs’ arguments that their absence did not cause an undue hardship, and that the district relies on “mere speculation” of an undue hardship, are contradicted by the undisputed summary judgment evidence. During plaintiffs’ absence, supervisors did drive; the district was forced to combine bus routes, causing delays; and the district was short of supervisors at the central transfer depot. An undue hardship may entail not only monetary concerns, but also an employer’s burden in conducting its business.
 
 See Brown v. Polk County, Iowa,
 
 61 F.3d at 655 (citations omitted).
 

 Plaintiffs allege that there is no merit to the district’s assertion that buses were delayed during the period the plaintiffs were absent, because Garner could not remember during his deposition on which days the delays had occurred. Garner and Schultz testified that delays resulted from the plaintiffs’ absences and have submitted competent supporting evidence. (Docket Entry No. 26, Exhibit C). Plaintiffs have not disputed this evidence with proper summary judgment proof. Plaintiffs also claim that any delays resulting from combining routes cannot constitute an undue hardship because the chronic driver shortage regularly required Favero Sr. to “double up” on his routes. Plaintiffs are again arguing that because driver shortages were “business-as-usual,” and because the district had failed to alleviate this short
 
 *1293
 
 age by hiring or retaining more drivers, the district cannot rely on the additional delays to establish undue hardship.
 
 [6]
 
 This court finds otherwise.
 

 Plaintiffs’ argument that because there were no children stranded by a broken down bus, plaintiffs’ absence could not have created a potential for delay in delivering the children, is also without merit. Plaintiffs’ emphasis on reviewing the situation in hindsight would allow employers to deny requests only when they were certain in advance that the requested absence would cause an undue hardship. This is not what Title VII requires.
 
 See Beadle v. City of Tampa,
 
 42 F.3d 633 (11th Cir.1995) (the city could deny request of trainee to skip training rotation because of Sabbath, out of advance concern that not rotating would negatively affect the recruit’s training).
 

 Plaintiffs also argue that Huntsville ISD has offered no explanation as to why it could provide plaintiffs with five days of leave, but could not grant eight days leave. Plaintiffs assert that Huntsville ISD has not shown that the shortage of drivers was different during the first five days than the last three days of the requested leave. This argument ignores the fact that, as the district points out, obtaining coverage for two additional absences for eight consecutive days is a heavier burden than doing so for five days. (Docket Entry No. 35, p. 4). Moreover, several other drivers had scheduled absences in the second week of plaintiffs’ leave. (Docket Entry No. 10, Schultz Affidavit). The court notes that although the district was unable to grant all eight days of plaintiffs’ request in September 1994, in prior years, plaintiffs had never requested more than seven consecutive days off. Moreover, Favero Jr. only began working as a driver for Huntsville ISD in January 1993; September 1993 was the only prior year in which both plaintiffs had requested an extended period of leave at the same time.
 

 In
 
 DePriest v. Dept. of Human Services,
 
 1987 WL 44454, a secretary requested two weeks off to attend the Feast of Tabernacles. The supervisor granted part of the leave but denied the rest, on the ground that the secretary had already used all of her leave for the year; the secretary and the supervisor were the only employees in their unit; and the previous absences had already caused a “small backlog” of work in the unit. The supervisor feared that a portion of the unit’s federal grant could be forfeited if the unit did not show progress. Had there not been a backlog, the supervisor might have permitted the leave. The court found that requiring the unit to suffer the secretary’s absence would have created an undue hardship. To the secretary’s argument that the “hardship” was mere speculation, the court answered, “[s]urely Congress did not intend that an employer must actually undertake an accommodation that will inevitably cause undue hardship.” Id. at *4.
 

 Plaintiffs challenge the credibility of Huntsville ISD’s witnesses and argue that these credibility issues preclude summary judgment. Plaintiffs point to Craycraft’s deposition testimony that Garner was the only Huntsville ISD employee with information as to whether granting the requested leave would have caused undue hardship. (Docket Entry No. 30, p. 6 and Craycraft Deposition, p. 39). Craycraft testified that she had no personal knowledge as to why it was decided that plaintiffs could have the first five days leave but not the second three days and that she was relying completely on what Garner had told her when she stated in her September 20, 1994 letter to plaintiffs that granting the additional leave would cause an undue hardship. (Id., Craycraft Deposition, p. 53). Plaintiffs argue that the district’s case rests on Garner’s credibility, which is at issue.
 
 [7]
 

 The issue before this court is whether the undisputed evidence as to the effect on the
 
 *1294
 
 district of granting the requested leave, viewed most favorably to plaintiffs, constitutes an undue burden as a matter of law.
 
 Hardison,
 
 432 U.S. at 63, 97 S.Ct. at 2264. A careful review of the summary judgment record reveals no disputed material fact issues which turn, even in part, on Garner’s credibility. The undisputed facts as to the regular, substitute, and other drivers available and used, and the effect on Huntsville ISD’s operations, viewed in the light most favorable to plaintiffs, establish a more than
 
 de minimis
 
 loss of efficiency. Assuming plaintiffs are correct that Huntsville ISD could have used licensed drivers whose assigned jobs did not include driving buses, the effect is more than a
 
 de minimis
 
 burden, and that is the legal standard.
 
 Hardison,
 
 432 U.S. at 68-70, 97 S.Ct. at 2269;
 
 See also Brown v. Polk County, Iowa,
 
 61 F.3d 650, 655 (8th Cir.1995),
 
 cert. denied,
 
 — U.S. -, 116 S.Ct. 1042, 134 L.Ed.2d 189 (1996) (when the work an employee would otherwise be doing must be postponed, the employer incurs more than a
 
 de minimis
 
 burden).
 

 Huntsville ISD has established that it suffered such an undue hardship as a result of plaintiffs’ eight-day absence. This result is harsh, but reflects the tension between an employee’s rights and an employer’s needs. As one court has noted:
 

 We are not without sympathy for employees trapped between their jobs and deeply held religious beliefs. Religious faith is ordinarily consistent with most employment obligations. When the two conflict, Congress has ordered that employers must try to accommodate their employees’ religious practices. Perhaps there were other steps that could have been taken here that would have allowed [the employee] to continue working at [his job] without infringing his religious convictions. We believe, however, that the [employer] has done all that Title VII requires and, therefore, that it is entitled to summary judgment.
 

 Wright v. Runyon,
 
 2 F.3d at 217-18.
 

 Huntsville ISD’s motion for summary judgment on the Title VII claim is GRANTED.
 

 III. Breach of Contract
 

 Plaintiffs allege that when they were hired, they were guaranteed that they would be permitted to take religious leave whenever necessary. Plaintiffs claim that their termination constitutes a breach of this contract. Plaintiffs assert that they told Garner that unless they were given such a guarantee, they would not accept the jobs.
 

 Huntsville ISD denies that it made any guarantee to plaintiffs. Garner admitted in his deposition that he cannot recall what he told plaintiffs when they were hired. Plaintiffs assert that at least, there is a fact issue as to Gamer’s authority to bind the district.
 

 Huntsville ISD argues that as a matter of law the school district cannot be bound by Garner’s representation. Under Texas law, a school district can act only by and through its Board of Trustees.
 
 Kingsville Indep. Sch. Dist. v. Cooper,
 
 611 F.2d 1109, 1112 (5th Cir.1980); see
 
 also Moore v. Knowles,
 
 377 F.Supp. 302 (N.D.Tex.1974),
 
 ajfd,
 
 512 F.2d 72 (5th Cir.1975). Tex.Educ. Code 11.151 provides as follows:
 

 (a) The trustees of an independent school district constitute a body corporate and in the name of the district may acquire and hold real and personal property, sue and be sued, and receive bequests and donations or other moneys or funds coming legally into their hands.
 

 (b) The trustees as a body corporate have the exclusive power and duty to govern and oversee the management of the public schools of the district. All powers and duties not specifically delegated by statute to the agency or to the State Board of Education are reserved for the trustees, and the agency may not substitute its judgment for the lawful exercise of those powers and duties by the trustees.
 

 (d) The trustees may adopt rules and bylaws necessary to carry out the powers and duties provided by Subsection (b).
 

 
 *1295
 
 Plaintiffs argue that there is a fact issue as to Garner’s apparent authority to bind the district. The district argues that there is no evidence of conduct by the principal — Huntsville ISD — -which was communicated to and reasonably relied upon by the party alleging agency — plaintiffs — to raise a fact issue as to apparent authority.
 
 Ames v. Great Southern Bank,
 
 672 S.W.2d 447, 450 (Tex.1984);
 
 Southwest Title Ins. Co. v. Northland Bldg. Co.,
 
 552 S.W.2d 425, 428 (Tex.1977);
 
 Currey v. Lone Star Steel Co.,
 
 676 S.W.2d 205, 209 (Tex.App.—Ft. Worth 1984, no writ),
 
 citing Biggs v. United States Fire Ins. Co.,
 
 611 S.W.2d 624 (Tex.1981);
 
 Southwest Land Title Co. v. Gemini Fin. Co.,
 
 752 S.W.2d 5, 7 (Tex.App.—Dallas 1988, no writ);
 
 Maccabees Mut. Life Ins. Co. v. McNiel,
 
 836 S.W.2d 229, 232 (Tex.App. — Dallas 1992, no writ).
 

 Plaintiffs argue that
 
 Bowman v. Lumberton Independent School District,
 
 801 S.W.2d 883, 888 (Tex.1990) supports their argument that apparent authority can bind a school district. In
 
 Bowman,
 
 the Texas Supreme Court noted that the general rule is that “when a unit of government is exercising its governmental powers, it is not subject to estoppel____”
 
 Id.
 
 at 888. However, the court found that estoppel could apply against a school district when the school district’s superintendent and district finance manager had issued paychecks as agents of the board of trustees, within the scope of their apparent authority. The court found estoppel applicable because the actions of the superintendent were taken with the “knowledge and implicit approval of the board.”
 
 Id.
 
 The court found that a “subordinate officer in such a case need not have the express approval of the entire board ... [where] the evidence clearly indicate[d] that the subordinate officer’s aet[s] [were] done with the knowledge of the governing body and [were] so closely related to the expressed will of the governing body as to constitute [an] act ... of the board ... itself.”
 
 Id.
 

 In the present case, the express will of the Board of Trustees is found in the written Huntsville ISD policy on religious observances, which states as follows:
 

 The District shall reasonably accommodate an employee’s request to be absent from duty in order to participate in religious observances and practices, so long as it does not cause undue hardship on the conduct of District business. Such absence shall be without pay unless applicable paid local leave is available. 42 U.S.C. 2000e(j), 2000e-2(a);
 
 Ansonia Bd. of Educ. v. Philbrook,
 
 [479 U.S. 60] 107 S.Ct. [367] 2367 [93 L.Ed.2d 305] (1986);
 
 Pinsker v. Joint Dist. No. 28J of Adams and Arapahoe Counties,
 
 735 F.2d 388 (10th Cir.1984).
 

 (Docket Entry No. 26, Exhibit B, Huntsville ISD Policy DEC (Legal)).
 

 In contrast to the facts in
 
 Bowman,
 
 there is no evidence in this case that Garner’s alleged “guarantee” was made with the knowledge or consent of the Board, or that his statements were “so closely related” to the expressed will of the Board as to constitute an act of the Board. To the contrary, Garner’s alleged statement that plaintiffs would receive all necessary religious leave, even if granting such leave imposed an undue hardship on the district, is in direct contradiction to the Board’s official written policy. This ease therefore bears no resemblance to the facts in
 
 Bowman,
 
 which raised a “well recognized exception[ ] ” to the general rule that estoppel may not bind a school district.
 
 Bowman,
 
 801 S.W.2d at 888.
 

 This court finds that apparent authority is inapplicable in the present ease and that plaintiffs cannot establish the formation of a binding contract, as a matter of law.
 

 IV. Estoppel
 

 Plaintiffs argue, in the alternative, that if no contract was formed to grant plaintiffs all necessary religious leave under any circumstances, Huntsville ISD is liable under the doctrine of promissory estoppel. Huntsville ISD argues that school districts are not subject to claims of estoppel.
 

 The doctrine of promissory estoppel may not be asserted when a government agent’s actions exceed the scope of his authority or are contrary to statute or regulation.
 
 F.D.I.C. v. Royal Park No. 14, Ltd.,
 
 800 F.Supp. 477, 480 (N.D.Tex.1992),
 
 affd,
 
 2 F.3d 637 (5th Cir.1993). The Texas Supreme Court has held that a governmental body is
 
 *1296
 
 subject to estoppel only when acting in its proprietary capacity; when exercising governmental powers, it is not subject to estoppel.
 
 Leeco Gas & Oil Co. v. County of Nueces,
 
 736 S.W.2d 629, 630 (Tex.1987);
 
 City of Hutchins v. Prasifka,
 
 450 S.W.2d 829, 835 (Tex.1970).
 

 Plaintiffs argue that governmental entities can be subject to estoppel when justice requires, and where there is no interference with the exercise of its governmental functions.
 
 See Bowman v. Lumberton Independent School Dist.,
 
 801 S.W.2d 883, 888 (Tex. 1990);
 
 Pena v. Rio Grande City Consolidated Independent School Dist.,
 
 616 S.W.2d 658, 659-60 (TexApp.—Eastland 1981, no writ);
 
 Hinojosa v. State,
 
 648 S.W.2d 380, 385-86 (TexApp.—Austin 1983, writ ref d n.r.e.).
 

 In
 
 Dillard v. Austin Indep. Sch. Dist.,
 
 806 S.W.2d 589 (TexApp.—Austin 1991, writ denied), the court held that because a school district by law exercises only governmental functions, promissory estoppel cannot apply to school districts.
 
 Id.
 
 at 594-95. This court finds that plaintiffs may not assert a cause of action against Huntsville ISD under the doctrine of promissory estoppel.
 

 V. Article I, § 6 of the Texas Constitution
 

 Plaintiffs assert a claim for violation of Article I, § 6 of the Texas Constitution. In
 
 City of Beaumont v. Bouillion,
 
 896 S.W.2d 143 (Tex.1995), the court held that there is no implied private right of action for damages for a violation of the Texas Constitution.
 
 Id.
 
 at 148-49. The court held that Texas does not recognize a common law cause of action for damages for violations of constitutional rights.
 
 Id. at 150.
 

 Recent decisions interpreting
 
 City of Beaumont
 
 have agreed that the Court’s holding was not limited to the specific provisions of the Texas Constitution at issue in that case.
 
 See, e.g., Vincent v. West Texas State Unix.,
 
 895 S.W.2d 469, 475 (TexApp.—Amarillo 1995, no writ) (no private right of action exists for violations of Article I, § 3a, a provision of the constitution not at issue in
 
 City of
 
 Beaumont). At least three other courts have dismissed claims for damages brought under the Texas Constitution.
 
 See Cote v. Rivera,
 
 894 S.W.2d 536 (TexApp.—Austin 1995, no writ);
 
 City of Alamo v. Montes,
 
 904 S.W.2d 727 (TexApp. —Corpus Christi 1995, no writ);
 
 Jones v. City of Stephenville,
 
 896 S.W.2d 574 (TexApp.—Eastland 1995, no writ).
 

 Even if plaintiffs could maintain a cause of action under section 6, plaintiffs do not state how the conduct of Huntsville ISD violated section 6. Section 6 states as follows:
 

 All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences. No man shall be compelled to attend, erect or support any place of worship, or to maintain any ministry against his consent. No human authority ought, in any case whatever, to control or interfere with the rights of conscience in matters of religion, and no preference shall ever be given by law to any religious society or mode of worship. But it shall be the duty of the Legislature to pass such laws as may be necessary to protect equally every religious denomination in the peaceable enjoyment of its own mode of public worship.
 

 Tex. Const. Art. I, § 6 (1876).
 

 Huntsville ISD did not attempt to establish a religion or to give preference to any religion by terminating plaintiffs. The issue presented is that of reasonable accommodation, which is addressed by the Texas Commission on Human Rights Act, Tex.Lab.Code § 21.051 (“TCHRA”). Plaintiffs did not plead TCHRA as a cause of action.
 

 Huntsville ISD’s motion for summary judgment on the Texas Constitution claim is GRANTED.
 

 YI. Conclusion
 

 Huntsville ISD’s motion for summary judgment is GRANTED. The remaining motion is MOOT.
 

 [1]
 

 . Also pending is a motion to stay discovery, for protective order, and to quash subpoena, filed by Huntsville ISD (Docket Entry No. 18). This motion is MOOT.
 

 [2]
 

 .
 
 The information as to the religious days both plaintiffs took off from work, without pay, is as follows:
 

 Favero Sr.
 

 1991 September 9, 1991 September 18, 1991
 
 *1285
 
 September 22-September 30, 1991 (5 days)
 

 1992 September 28, 1992 October 12-October 20, 1992 (7 days)
 

 1993 September 16, 1993 September 29-October 7, 1993 (7 days)
 

 1994 September 6, 1994 September 15, 1994
 

 Favero Jr.
 

 1993 September 16, 1993 September 29-October 7, 1993 (7 days)
 

 1994 September 6, 1994 September 15, 1994
 

 [3]
 

 . There is a dispute as to whether plaintiffs asked for leave on September 29 or whether plaintiffs intended to return to work on that day. For the purpose of this motion, this court assumes that plaintiffs sought leave through September 28, for a total of eight consecutive working days off.
 

 [4]
 

 . The court continued:
 

 We do not mean to say that [the employer] must bow to [the plaintiff's] demands no matter what cost or effort is required. There may have been reasonable means, such as allowing her to swap shifts, in which [the employer] could have accommodated [plaintiff's] religiously required forbearance from work for one week a year. That is a question of fact.
 

 Id.
 
 at 74.
 

 In the present case, by contrast, the facts are undisputed that there were no other means to accommodate plaintiffs' religiously required forbearance from work other than to grant them leave to do so.
 

 [5]
 

 . The record shows that Gail Thompson drove the AM routes on September 19, 20, 22, 23, 26, 27 and 29, and the PM routes on September 19, 20, 21, 22, 26 and 27. Stephanie Ziober drove the AM routes on September 20, 21, 22, 26, 27, 28 and 29, and the PM routes on 19, 20, 21, 22, 27, 28 and 29. (Docket Entry No. 35, Exhibit H).
 

 [6]
 

 . Plaintiffs offer several hypothetical other reasons why buses could be delayed, i.e. weather, traffic, etc., but Gamer testified that these were not the reasons that the buses were delayed on the days plaintiffs were absent. (Docket Entry No. 35, Exhibit A, pp. 127-28).
 

 [7]
 

 . Gamer testified in his deposition that he recalled driving several days and that Schultz drove every day from the time period from September 19 through 28. (Docket Entry No. 10, p. 5; Docket Entry No. 30, Gamer Deposition, p. 105). However, Huntsville ISD admits that Schultz was on vacation on September 26 and 27, 1994 and that Schultz drove only on September 29, the day that plaintiffs reported to work but were not permitted to drive. (Docket Entry No. 30, Schultz Deposition, pp. 19-22, 32-39).
 
 *1294
 
 The case does not rest on Gamer’s recollection of how many drivers were available and who they were, but on the undisputed summary judgment evidence of these facts.